IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| SHAWN BROWN, individually and as mother and next friend of A.B., a minor )<br><br>Plaintiff, )<br><br>v. )<br>)<br>WAL-MART STORES, INC., )<br>ASSOCIATES HEALTH AND )<br>WELFARE PLAN, )<br>)<br>Defendant. ) | CASE NO. 1:05-cv-810-MEF<br>(WO) |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

At issue in this case is whether an employee benefits plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., properly denied benefits to one of its covered employees. Plaintiff Shawn Brown ("Brown"), who is a carrier of a genetic disorder capable of being passed down to her children, sought coverage from Defendant Wal-Mart Stores, Inc., Associates Health and Welfare Plan (the "Plan") for surgical sterilization but was denied benefits. The Plan also denied coverage for a nutritional supplement therapy for Brown's daughter, who suffers from the genetic disorder. Brown also alleges she was denied coverage for genetic testing, but the Plan contends that it paid the benefits for this testing pursuant to Brown's policy. This cause is before the Court on Defendant's Motion to Affirm the Determination of the Administrative Committee or,

Alternatively, Motion for Summary Judgment (Doc. # 36). The Motion, which the Court will construe as a motion for summary judgment, is due to be GRANTED.

## II.  JURISDICTION

The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 29 U.S.C. §1132(e)(1) (ERISA). The parties do not contest personal jurisdiction or venue, and the court finds sufficient factual basis for each.

## III.  STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party.  An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, a court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. FACTS

The Court has carefully considered all deposition excerpts and documents submitted in support of and in opposition to the motion. The submissions of the parties, viewed in the light most favorable to the non-moving party, establish the following facts:

3

Brown is an employee of Wal-Mart Stores, Inc. Brown and her daughter, A.B., have medical coverage under the Plan. Brown has had this coverage since she began working for Wal-Mart in February 2000. A.B., who was born in February 2001, started suffering seizures when she was only eight months old. Doctors diagnosed A.B. with cellular mitochondria complex one defect. In October 2004, genetic testing of A.B.'s parents pinpointed Brown, A.B.'s mother, as the carrier of the gene responsible for A.B.'s condition.

The Plan, which is covered by ERISA, is self-funded. Wal-Mart Stores, Inc., the plan sponsor, funds the Plan through a separate trust. Blue Cross Blue Shield of Alabama ("Blue Cross") performs the initial claims processing but all payments of claims are paid from the trust and not from Blue Cross's coffers. In the event that a plan member disputes a claim determination, the member may appeal directly to the Plan. At that point, the Administrative Committee, which is the Plan's administrator and its fiduciary, makes a final benefit determination.[1]

---

[1] Under the section outlining the duties and powers of the Plan Administrator, the Plan's "Wrap Document" states:

> The Plan Administrator shall have complete discretion to interpret the provisions of the Plan, make findings of fact, correct errors, supply omissions, and determine the benefits payable under a Welfare Program.

Doc. 37 at 7. Brown does not dispute that the Plan Administrator has such delineated powers, but she argues that the Wrap Document is not controlling since she never received a copy of it. Instead, Brown argues that the Summary Plan Description, which she refers to in her brief as the "My Benefits" handbook, controls.

Administrative Committee members are paid by Wal-Mart Associates, Inc., a subsidiary of Wal-Mart Stores, Inc. However, committee members serve on a volunteer basis and do not receive any extra money or bonuses for doing so. Committee members maintain notes and memorandum about their meeting.[2] For the most part, these meeting notes state only who was in the meeting and what was decided.[3]

Committee members are required to file semi-annual reports with the Executive Vice-President of Benefits at Wal-Mart Stores, Inc. The content of the reports consist of information about who serves on the committee, when they've met, and delegations or resolutions to the Plan. The reports do not state how many claims were reviewed.

A.   *Brown's Claim for A.B.'s Treatment*

One proposed treatment for A.B.'s condition involved taking a nutritional supplement called Carnitor. Brown's claim for coverage for this treatment was initially denied by Blue Cross. The Plan's 2004 Summary Plan Description listed the following under the section "Charges Not Covered":

> **Vaccines, Vitamins, or Preventative Care**: Charges for vaccines, vitamins (whether oral or injectable), minerals, nutritional supplements, immunizations, or preventive medical

---

[2] These notes and memorandum are not part of the administrative appellate record. Brown argues that she is entitled to these notes or memorandum.

[3] According to Lisa Woods, the Director of Benefits for Wal-Mart Stores, Inc., these notes do not document discussions the Committee had about the cases.

5

care.

Doc 42-11. The *Clinical Pharmacology-World Class Drug Information* lists Carnitor as a nutritional supplement.[4]

Brown does not dispute that the 2004 Summary Plan Description excludes nutritional supplements from coverage but argues that such an exclusion was not contained within the 2003 Summary Plan Description and thus was added in 2004 without notice to her. This is not correct. In fact, the same exclusion can also be found in the 2003 Plan Summary Description, albeit under a slightly different subheading. *See* Doc. 42-10 at 4.

On April 18, 2005, Brown appealed Blue Cross's denial of her claim for Carnitor. On May 20, 2005, the Plan's Administrative Committee affirmed this denial and cited the 2004 Summary Plan Description. On June 20, 2005, Brown appealed again and, on July 6, 2005, the Administrative Committee reaffirmed the denial. In its decision, the Administrative Committee also cited the *Clinical Pharmacology-World Class Drug Information* which states that Carnitor is a nutritional supplement.

---

[4] Brown's position on whether Carnitor is a nutritional supplement is very unclear and inconsistent. At one point in her response to the Plan's Motion for Summary Judgment, Brown disputes whether Carnitor is actually a nutritional supplement. For this point, she submits a letter from a treating physician in Alexandria City, Alabama, Dr. Billy B. Sellers. Although Dr. Sellers notes that Brown had been "prescribed carnitor" by a doctor at Emory University in Atlanta, Georgia, at no time does Dr. Seller dispute the fact that Carnitor is a nutritional supplement. At another point in her response, as to the Plan's "undisputed statements of material fact" that Carnitor is a nutritional supplement, Brown states that she "does not assert that [the Plan] misstates the material."

*B. Brown's Claim for Surgical Sterilization*

Brown is a carrier of G1178 gene, which is the cause of A.B.'s condition. Because the genetic disorder is maternally transferred, any further children Brown had would certainly suffer from the disorder. For this reason, Brown's doctors advised her not to have anymore children. Brown's doctor concluded that "it was ... medically necessary to perform permanent sterilization on this patient."

On November 22, 2004, Brown underwent surgery for laparoscopic tubal ligation, a form of surgical sterilization. Blue Cross denied Brown's claim for tubal ligation. On December 21, 2004, Brown appealed and, on January 6, 2005, the Administrative Committee affirmed the denial. The Administrative Committee cited to the 2004 Plan Summary Description. Under "Charges Not Covered," the Summary Description listed the following:

> **Reproductive Systems**:
>
> Charges for or relating to any treatment or service for sterilization, sexual dysfunction, impotence, or family planning, and any complications arising therefrom.

Doc. 42-13. The Administrative Committee also relied on the Plan's Coverage Policy Manual. The Manual states the following:

> **Hysteroscopic Placement of Micro-Inserts in the Fallopian Tubes as a Form of Permanent Sterilization, Policy/Coverage**:
>
> Charges for or relating to any treatment or service for sterilization or reversal of sterilization, sexual dysfunction, impotence, or family planning, and any complications arising therefrom are a contract exclusion.

7

Doc. 37 at 18.  Brown does not dispute that the laparoscopic tubal ligation, which involved blocking the fallopian tubes, would be a contract exclusion pursuant to the Coverage Policy Manual.  However, Brown argues that since she never received the manual, and only received the Summary Plan Description, she was not on notice of this exclusion.  Furthermore, according to Brown, the surgery "is not specified in this manner in the exclusions listed in the 2004 [Summary Plan Description]," the document that Brown contends is controlling.

   *C.  The Genetic Testing*

On January 8, 2003, Blue Cross denied Brown's claim for the genetic testing which was used to identify Brown as the carrier of the genetic disorder.  Blue Cross argued that "benefits are not payable for treatment or services relating to genetic or chromosomal testing, counseling, or therapy, even if standard medical treatment." Doc. 42-2.  Brown appealed this denial and, on March 3, 2003, the Plan's Administrative Committee made an exception to the plan guidelines and permitted payment of benefits for Brown's visit to Dr. John Shoffner ("Dr. Shoffner") at Emory University.  Brown contends, however, that she was not reimbursed for the $7,100 she had already paid for the genetic testing.  Brown does not, however, present any evidence of this payment, save for assertions in her affidavit.

The Plan counters that it paid benefits for genetic testing pursuant to the Plan terms. In fact, as evidenced by six separate claim reports, the Plan paid $8,870.20 to Dr. Shoffner

for this testing. The Plan paid the $8,870.20 in the following amounts: $1,267.00, $152.00, $1,378.00, $3,600.00, $2,346.00, $127.20. Doc. 47-2.

The claim reports also indicate that some of the submitted charges "exceed the eligible charge which is the maximum allowance for this service."[5] Consequently, the reports indicate that Brown still owed Dr. Shoffner $4,320 after the Plan paid its share of the claim.[6] Some charges were not considered because they were duplicate claims. The duplicate claims total $2,532.00.[7]

## V. DISCUSSION

**A.     The Benefits Determinations**

Brown's state law claim for benefits from an employee welfare benefit claim covered by ERISA is construed as a claim brought under 29 U.S.C. § 1132(a) because Brown states a claim seeking relief "akin to" that provided for in section 1132(a). *Ervast v. Flexible Prods. Co.*, 346 F.3d 1007, 1014 (11th Cir. 2003). Section 29 U.S.C. 1132(a)(1)(b) permits

---

[5] As explained in Brown's Summary Plan Description, even where a member of the plan receives benefits, that member may be responsible for charges over the "usual, customary, and reasonable" rates. For example, the Description states that "[a]ll expenses that exceed usual, customary, and reasonable fees will be your responsibility and are not considered covered medical charges by the Plan." Doc. 46 at 17.

[6] The individual amounts owed by Brown are as follows: $1,103.00, $83.00, $921.00, $128.00, $2,054.00, and $31.00.

[7] The Plan asserts that Dr. Shoffner has not clarified whether the disputed claims were in fact duplicates and, further, "[i]f Dr. Shoffner's office ever does present evidence that these claims are not duplicates, the Plan would process these claims for payment in accordance with the Plan terms." Doc. 46-1 at 16.

9

a civil action by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

While denials of ERISA benefits are governed by 29 U.S.C. § 1132(a)(1)(B), the statutory scheme does not set forth a standard of review. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989), the United States Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone*, 489 U.S. at 114. The Supreme Court cautioned, however, that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* (quoting Restatement (Second) of Trusts § 187, Comment d (1959)).

The Eleventh Circuit "has adopted the following standards for reviewing administrator' plan interpretations: (1) *de novo* where the plan does not grant the administrator discretion[;] (2) arbitrary and capricious [where] the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where there is a conflict of interest." *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir. 2001) (quoting *Buckley v. Metropolitan Life,* 115 F.3d 936, 939 (11th Cir. 1997) (emphasis omitted); *see also Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321

(11th Cir. 2001). When a court reviews a claims administrator's benefits determination, the court must follows a series of steps. *Id.* At each step, the court makes a determination that results in either the progression to the next step or the end of the inquiry. *Id.*

First, a court begins by looking at the plan documents to determine whether the plan documents grant the claims administrator discretion to interpret disputed terms. *Id.* Here, the Plan unequivocally gives the Plan Administrator discretion to interpret disputed terms. The Wrap Document specifically provides for the Plan Administrator to have "complete discretion to interpret the provisions of the Plan, make findings of fact, correct errors, supply omissions, and determine the benefits payable under a Welfare Program."[8] Therefore, the Court will apply arbitrary and capricious review and possibly heightened arbitrary and capricious review.

Regardless of whether the Court applies an arbitrary and capricious standard of review or one that is "heightened," the Court must evaluate the claims administrator's interpretation

---

[8] Brown inexplicably argues that the Wrap Document and other Plan documents should not be considered and the Court should rely instead solely on the Summary Plan Description, the only document Brown received. Brown makes no legal arguments for this contention. In fact, ERISA specifically provides that the Summary Plan Description "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022. Thus, while the Summary Plan Description must reasonably apprise Brown of her rights and obligations, there is no requirement that the Summary Plan Description include everything possibly related to the Plan. Therefore, the Court finds Brown's argument unpersuasive as to the Wrap Document and other sources of information that the Plan relied upon in making its benefit determinations.

of the plan to determine whether it is "wrong." *Id.* (citing *Godfrey v. BellSouth Telecomm., Inc.,* 89 F.3d 755, 758 (11th Cir. 1996); *Brown v. Blue Cross & Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1566 n. 12 (11th Cir. 1990) ("[i]t is fundamental that the fiduciary's interpretation first must be 'wrong' from the perspective of *de novo* review before a reviewing court is concerned with the self-interest of the fiduciary.")).

"Wrong" is the label used to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation. *Id.* at 993-94 (citing *Yochum v. Barnett Banks, Inc.,* 234 F.3d 541 (11th Cir. 2000); *Marecek v. BellSouth Telecomm., Inc.,* 49 F.3d 702, 705 (11th Cir.1995) (explaining a court must decide if the administrator correctly interpreted the plan); *Brown,* 898 F.2d at 1566 n. 12 (citations omitted) (explaining that the first step in application of arbitrary and capricious standard is determining legally correct interpretation of disputed plan provision)). If the court agrees with the ultimate decision of the administrator, it will not decide whether a conflict exists. *Id.* at 993-94 & n. 23 (citing *Marecek,* 49 F.3d at 705). Only when the court disagrees with the decision, i.e. the decision is wrong, does it look for a conflict and, when it finds such a conflict, it reconsiders the decision in light of this conflict. *Id.*

First, as to the denial of benefits for Carnitor, it is important to note that the 2004 Summary Plan Description lists "vitamins (whether oral or injectable), minerals, [or] nutritional supplements" under the heading "charges not covered," Doc. 42-11, and *The*

*Clinical Pharmacology-World Class Drug Information* states that Carnitor is a nutritional supplement. Brown does not dispute the fact that Carnitor is a nutritional supplement but bases her objection to this finding on the fact that this finding "reference[s] material Plaintiff was never furnished." Doc. 42-1 at 3 (as ¶ 8 of the Plan's undisputed statements of material fact, "Plaintiff does not assert that Defendant misstates the material, but rather argues the material is not applicable or is subject to a different interpretation when compared with the [Summary Plan Description].").[9] Brown does not give any legal reason, either controlling precedent or provisions from the Plan, why the *Clinical Pharmacology-World Class Drug Information* should not be consulted or why it is not controlling if Brown wasn't furnished it. ERISA does not require a health benefits plan to recite every exclusion and inclusion in the Summary Plan Description, see 29 U.S.C. § 1022, and this makes sense. Otherwise, the document would not be called a "summary." The Court concludes that the Plan's determination that Brown was not entitled to benefits for Carnitor was not "wrong."

The Court also finds that the Plan's denial of benefits for Brown's claim for the sterilization procedure was not "wrong." Given that the Summary Plan Description clearly excludes charges for "sterilization" and the tubal ligation is a form of sterilization, an admission even Brown makes in her briefs and a fact affirmed by her doctors, the procedure

---

[9]Oddly, Brown contradicts herself later in her response to the Plan's Motion for Summary Judgment by trying to argue that Carnitor is not a nutritional supplement afterall. See *supra* note 4 for a discussion of the letter from one of Brown's treating physicians. Likewise, in that same portion of her response, Brown describes Carnitor as a "vitamin therapy," something explicitly not covered in the Summary Plan Description.

was not covered by the Plan.

Finally, when it comes to Brown's claim for genetic testing, the Court is surprised that Brown made it this far in the process of litigation without examining the claim reports. It clearly indicates on the reports that the Plan made payments towards the genetic testing and that charges that went above and beyond the usual, customary, and reasonable rates, Brown would be responsible for paying. While Brown has submitted no document to conclusively show how much she actually paid towards the genetic testing, what is clear from the reports is that she owed the doctor $4,320. Brown attests that she paid $7,100. The overpayment by Brown can be explained by the $2,532 of apparent duplicate claims. If those claims are actually not duplicates, and Brown's doctor refiles, Brown may still get a favorable benefit determination. If the claims are in fact duplicates, Brown's grievance lies with the doctor's billing department for her overpayment. Therefore, the benefits determination as to the genetic testing was not "wrong."

Because the Plan's benefit determinations were not "wrong," it is not necessary to consider whether an arbitrary and capricious standard is appropriate or if a heightened one is required instead.[10] The Plan's Motion for Summary Judgment on the benefit

---

[10] It is worth noting had the Court found the benefits determinations "wrong" and thus gone to the next step in the analysis, the Court would have applied an arbitrary and capricious standard of review and not, as Brown suggests, a heightened arbitrary and capricious standard. Brown's allegations of a conflict of interest are not persuasive. While Brown cites to *Brown v. Blue Cross & Blue Shield* for the proposition that "[b]ecause an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business," 898, F.2d

determinations is due to be GRANTED.

**B.    Breach of Fiduciary Duty Claim**

Brown's state law claim for breach of fiduciary duty would be construed as a claim under the catch-all provision of 29 U.S.C. § 1132(a)(3). *See Varity Corp. v. Howe*, 516 U.S. 489, 511-12 (1996); *Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 826 (11th Cir. 2001). The Plan argues, however, that Brown's claim of breach of fiduciary duty would therefore be barred as a matter of law because another section of 29 U.S.C. § 1132(a) – specifically section 1132(a)(1)(b) -- provides her with an avenue to seek relief.

While Brown does not specifically contest this in her response to the Plan's Motion for Summary Judgment, it is worth noting that the Eleventh Circuit Court of Appeals has spoken directly on this issue in *Ogden v. Blue Bell Creameries U.S.A., Inc*., 348 F.3d 1284 (11th Cir. 2003). In *Ogden*, the Eleventh Circuit held that "an ERISA plaintiff has no cause of action under [29 U.S.C. 1132(a)] where Congress provided for an adequate remedy elsewhere in the ERISA framework, even if res judicata now bars the adequate remedy

---

1556, 1561 (11th Cir. 1990), that Eleventh Circuit opinion is easily distinguishable. Here, while Blue Cross Blue Shield of Alabama makes initial coverage determinations, payments to beneficiaries do not come from Blue Cross's own assets. Instead, because the Plan is self-funded, payments to beneficiaries come from a trust for which the Administrative Committee is the fiduciary. As noted in the Plan's briefs, and, conveniently enough, by the Eleventh Circuit opinion to which Brown relies on so heavily, it is a totally different scenario where a plan is "self-insured and the insurance company act[s] as an administrator and receiv[es] full reimbursement from the plan sponsor for covered medical claims." *Id.* at 1562 (citing *Jett v. Blue Cross & Blue Shield*, 890 F.2d 1137, 1138 (11th Cir. 1989). In such a case, the Court would apply the more deferential arbitrary and capricious standard of review.

provided." *Id.* at 1285. Therefore, because Brown asserts a claim for benefits under section 1132(a)(1)(B), Brown cannot alternatively plead and proceed under section 1132(a)(3). For these reasons, the Plan's Motion for Summary Judgment on this claim for breach of fiduciary duty is due to be GRANTED.

## VI.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

(1) The Motion to Affirm the Determination of the Administrative Committee or, Alternatively, Motion for Summary Judgment (Doc. # 36) is GRANTED.

(2) The trial scheduled in this matter is CANCELLED.

A separate final judgment will be entered in accordance with this Memorandum Opinion and Order.

DONE this the 12th day of March, 2007.

/s/ Mark E. Fuller<br>
CHIEF UNITED STATES DISTRICT JUDGE